Gregg Fitzgerald BAILEY and Lizzie Shirley Bailey, Plaintiffs–Appellants–Cross–Appellees,

v.

BOARD OF COUNTY COMMISSIONERS OF ALACHUA COUNTY, FLORIDA, Eugene T. Whitworth, State Attorney of the Eighth Judicial Circuit of Florida, in his individual and official capacities, L.J. "Lu" Hindery, Sheriff of Alachua County, Florida, in his individual and official capacities, City of Gainsville, Florida, John Stanton Tileston, Sr., James Strauss, Farnell Cole, Gary Brown, Charles Jerkins, Tom L. Allison, Spencer Mann, Stephen Garrahan, Defendants–Appellees,

Nathaniel Caldwell, Colleen Hayes, Defendants–Appellees, Cross–Appellants.

No. 91–3275.

United States Court of Appeals, Eleventh Circuit.

March 31, 1992.

Peter J. Hurtgen, Morgan, Lewis & Bockius, Miami, Fla., for Caldwell.

Thomas A. Bustin, Alachua Co. Atty's Office, Gainesville, Fla., for Hayes.

Robert C. Widman; Nelson, Hesse & Cyril, Sarasota, Fla., Joseph W. Little, Gainesville, Fla., for Bailey.

Ronald A. Labasky; Parker, Skelding, Labasky & Corry, Jennifer Parker Lavia, Tallahassee, Fla., for Cole.

Louis F. Hubener, III, Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for Tileston.

H. Jack Klingensmith; Jorden, Schulte & Burchette, Miami, Fla., for City of Gainesville.

Thomas H. Duffy, Tallahassee, Fla., for Allison.

Before ANDERSON and DUBINA, Circuit Judges, and ESCHBACH [*], Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge:

Near the end of his graveyard work shift on May 14, 1987, Gregg Fitzgerald Bailey was arrested as the result of an undercover investigation at the Alachua County Detention Center (ACDC). Bailey had been a corrections officer (a prison guard) at ACDC since 1985. Based on his arrest and subsequent events, which included Bailey's suspension without pay from ACDC, Bailey and his wife (Lizzie Shirley Bailey) began this § 1983 action against two governmental entities (Alachua County and the City of Gainesville) and twelve individuals (Stephen Garrahan, James Strauss, Gary Brown, Tom L. Allison, John S. Tileston, Nate Caldwell, Colleen Hayes, Farnell Cole, Charles Jerkins, Spencer Mann, Eugene Whitworth and L.J. "Lu" Hindery) (collectively, "the defendants"). Most of the defendants exited this litigation either through summary judgments or dismissal motions prior to trial or through directed verdicts at the close of testimony, leaving only three defendants (Caldwell, Hayes and Alachua County) to go to the jury on Bailey's then-remaining claims. The jury returned a verdict in favor of Bailey against Caldwell and Hayes, awarding Bailey damages of $2,182,406. The jury exonerated Alachua

County from liability. Bailey now appeals many of the summary judgments and directed verdicts as well as the jury's verdict for Alachua County; Caldwell and Hayes cross appeal the jury verdict against them. As discussed below, we affirm in part, reverse in part, and remand for a new trial against Caldwell, Hayes and Allison solely on Bailey's procedural due process claims stemming from his suspension.

## I. FACTS

### A. Background

On April 22, 1987, several inmates attempted to escape from ACDC by sawing a window with hacksaw blades. Lieutenant Brown, with the assistance of another ACDC officer, investigated the attempted escape and discovered that an inmate-trustee (Tribuani) had obtained the blades from a tool box in a maintenance room to which he had been allowed access. Tribuani had concealed the blades in his pants until he was able to pass the blades to other inmates, one of which was Charles Jerkins. Subsequently, Jerkins twice informed Brown that persons who were not inmates had assisted in the escape attempt. After consultation with Allison, who was then Assistant Director of ACDC, Brown contacted the State Attorney's Office to investigate the potential wrongdoing by ACDC employees.

As a result of Brown's contact, Tileston, who was serving as a Special Prosecutions Investigator with the State Attorney's Office, was assigned to investigate Jerkins' allegations. Tileston spoke with Brown, who told him that Jerkins' had said that a "professional person" had assisted in the April escape attempt.[1] Tileston was familiar with Jerkins because Jerkins was well known as both a criminal and a "snitch" to local law enforcement authorities. Tileston testified that Jerkins was a "known credible police source" and that he had verified through city and county law enforcement

[*] Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Although Brown had completed a full report regarding his own investigation into the escape attempt, he did not give Tileston this written investigative report.

officers that Jerkins had provided reliable information in the past. Tr. 38–575–12, 13; Tr. 27–561–129, 130.

On May 8, 1987, Tileston interviewed Jerkins and Jerkins named Bailey as a participant in bringing hacksaw blades into the jail. Jerkins described letters he had written to his girlfriend in which he had urged her to contact Bailey to arrange to bring hacksaw blades into the jail. Jerkins said that he and Bailey had developed a prior personal relationship. Jerkins knew Bailey's phone number and told Tileston that he had offered Bailey both $500 and $1000 for hacksaw blades.

Tileston decided that he needed to test whether Bailey would accept money from Jerkins, and devised an undercover plan for this purpose. Because his office did not have the necessary equipment for his plan, Tileston obtained $500 cash and a body bug from the combined Gainsville/Alachua County Narcotics and Organized Crime Unit (NOCU). Furthermore, NOCU's Deputy Cole was assigned to provide Tileston technical assistance with the listening equipment. Tileston's plan was to give Jerkins the $500 with instructions to offer it to Bailey. A body bug would be placed on Jerkins so that any conversations between Bailey and Jerkins could be heard and recorded. Cole's responsibility was to monitor the listening equipment.

B. Bailey's Arrest

Tileston elected to conduct his test during Bailey's May 14 work shift. Brown, who was serving as Tileston's liaison with ACDC, arranged to wire Jerkins and to give him the $500 before Bailey came on duty. One of Brown's Lieutenants (Strauss) actually placed the body bug on Jerkins and gave him the $500. Jerkins was instructed to tell Bailey he had the money and to try to get into a conversation with Bailey about hacksaw blades. Although Bailey had access to Jerkins throughout his shift because he was responsible for the jail area in which Jerkins was housed, a further opportunity for conversation between the two men was contrived when Tileston had one of Bailey's

superiors instruct Bailey to remove Jerkins from his cell (ostensibly for more fingerprinting and charges) and then put him back.

Reception from the body bug was poor; Cole reported hearing a few snippets of conversation through his listening device, but a tape recording made of this conversation was later found to be inaudible. Specifically, at 12:08 a.m. Cole reported hearing Jerkins mention the "$500." Tileston, Brown and Cole, who were stationed in Allison's office, continued their monitoring throughout the night. At 6:21 a.m., Cole reported that he heard mention of "hacksaw blades" transmitted through Jerkins' body bug. At this time, Tileston wanted to know if the money had passed from Jerkins to Bailey. Brown ascertained through Sullivan that the money had passed to Bailey and relayed this information to Tileston. After a brief discussion, and wanting to capture the money before Bailey's shift ended at 7:00 a.m., Tileston and crew headed for the part of the jail where Bailey was stationed.

After locating Bailey, who was supervising the morning feeding of the prisoners, Tileston and Cole showed Bailey their badges and were introduced by Brown. Tileston then asked Bailey to accompany them to Allison's office to answer questions. No conversation transpired between Bailey and these officers during the five to ten minute walk to Allison's office. In Allison's office, Tileston informed Bailey that he was under arrest and Cole read Bailey his *Miranda* rights. After being asked about the money, Bailey removed it from his right front pants pocket, put it on the desk, and made a statement that no fingerprints would be found on the money. The money was wrapped in white paper. Bailey also said that he had talked to two officers about what was happening, but gave no specific information about these contacts. Tr. 38–575–47, 36–568–34 to 36. Bailey then requested an attorney and questioning ceased.

What Bailey's version of the arrest and the events leading up to it add to this account is insubstantial. Bailey's story re-

veals that Jerkins handed him a sock full of money, which he took because he knew he was supposed to confiscate contraband in the jail. According to Bailey, he dumped the money onto a piece of white paper, hoping to preserve the fingerprints of whomever had given the money to Jerkins. At first, Bailey put this bundle into a desk, and then twice tried with no avail to reach a supervisor. When Bailey noticed several inmate-trustees approaching, however, he feared for the money's security and removed it from the desk and placed it in his pocket. He then went about his duties of overseeing inmate feeding, thinking that he would notify a supervisor once that duty was finished. He was arrested while attending to this duty.

## C. Bailey's Suspension

On the morning of his arrest, Bailey was given a letter written by Allison suspending him without pay "as of 0700 hours May 14, 1987" and stating that dismissal proceedings would be taken against him if he had not "rectified the prerequisites of his job within 15 days." Bailey was then notified a second time that he was suspended without pay. By letter dated May 26, 1987, Allison advised Bailey that "effective today, you are hereby placed on suspension without pay until further notice." The parties' third communication was a November 19, 1987 letter from Bailey to Caldwell (Alachua County's Director of Corrections) asking for reinstatement, or a hearing if reinstatement was denied, or information on how to request a hearing if he was proceeding improperly. A decision by the State Attorney's Office to enter a `nolle prosequi` as to all criminal charges filed against Bailey had prompted this letter to Caldwell. Caldwell directed Bailey's letter to Allison,[2] who responded on December 7, 1987 by denying Bailey's request and noting that his "leave without pay" would continue pending the completion of an investigation. ACDC had requested that the Florida Department of Law Enforcement (FDLE), the body charged with certifying

Florida's law enforcement officers, investigate the possibility of decertifying Bailey.

The FDLE informed Caldwell that there was no basis for further action against Bailey via letter on June 9, 1988. Garrahan then requested that FDLE reopen its investigation, the status of which was uncertain at the time of trial. Caldwell, however, instructed Edward A. Royal, who replaced Allison when he left ACDC on February 13, 1988, to order Bailey back to work. By letter dated June 15, 1988, Royal informed Bailey that he would receive back pay and ordered him to report to work on June 20, 1988.

## D. Bailey's Reinstatement

Bailey reported to work on June 20, with his lawyer and a letter from his psychiatrist in tow. Dr. Waldman, who had been treating Bailey since March 1988, Tr. 24–572–177, advised Bailey against returning to work at ACDC at that time. Thus, Bailey requested his back pay and asked that he be placed on sick leave until his benefits were exhausted, then placed on annual leave. See Plaintiffs Exhibit 13–A (Bailey's counsel's letter); Deposition Exhibit 52 (Bailey's hand-delivered letter to this effect). The following day, Dr. Waldman initiated an involuntarily commitment to Shands Hospital on behalf of Bailey. Dr. Waldman diagnosed Bailey as suffering from a psychotic breakdown and considered him to be a threat to himself and others (particularly at ACDC). Bailey's status at Shands was subsequently converted to voluntary and he remained there for about five weeks.

Although Royal's June 15, 1988 letter promised Bailey "any and all back pay and entitlements," no monies were tendered to Bailey until September 29, 1989, almost a year after Bailey filed this lawsuit. See Defendant's Exhibit 4. The record is unclear as to whether this was an unconditional tender of back pay or an effort at settlement. See Defendant's Exhibit 5. In

---

**2.** Caldwell was no longer Director of Corrections; Allison was Acting Director of Correc-tions.

any case, it is uncontroverted that the check (wherever and whatever it may be) has not been cashed. Tr. 32–480–29 to 32. The record also leaves unclear Bailey's status with ACDC at the time of trial. No hearings have been held regarding Bailey's employment status with ACDC.

## II. PROCEDURAL HISTORY

Bailey's First Amended Complaint (the "Complaint") sought compensatory, punitive and injunctive relief pursuant to 42 U.S.C. § 1983 and state law. The Complaint alleged under § 1983 that the defendants deprived Bailey of liberty and property without due process of law, and conspired to do so, by arresting him without probable cause, publicizing the arrest, and subsequently suspending him. The Complaint also alleged pendent state-law causes of action based on false arrest, malicious prosecution, civil conspiracy, and violation of state civil rights. For analytical ease we have classified Bailey's claims into five categories: (1) Bailey's § 1983 claim that various defendants violated his due process rights by depriving him of a protected property interest in his employment by suspending him without pay and without granting him a hearing (the "procedural due process claim"); (2) Bailey's § 1983 claim that various defendants violated his due process rights by depriving him of a protected liberty interest by maintaining stigmatizing information in his personnel file and not granting him a name-clearing hearing (the "name-clearing hearing claim"); (3) Bailey's § 1983 claim that various defendants conspired to deprive him of his civil rights (the "conspiracy claim"); (4) all of Bailey's claims concerning his allegedly unlawful arrest and the publication to the news media of the arrest (the "arrest-related claims"); and (5) all of Bailey's remaining state claims and all of Lizzie Shirley Bailey's loss of .consortium claims, none of which has been raised on appeal. Accordingly, we deem waived any challenge to the district court's orders on this final category of claims.

All defendants filed motions to dismiss and/or motions for summary judgment in response to Bailey's Complaint. In July 1990, the district court entered an omnibus order granting in part motions to dismiss or for summary judgment filed by various defendants. In that order, the district court granted summary judgment on the basis of qualified immunity as follows: to Brown, Allison, Caldwell, Cole and Hayes on Bailey's conspiracy and arrest-related claims; to Brown and Cole on Bailey's procedural due process claim; and to Allison, Caldwell and Hayes on part of Bailey's procedural due process claim (his "initial" suspension).[3] The district court denied Allison, Caldwell, Hayes and Alachua County qualified immunity as to Bailey's procedural due process claim regarding his "continued" suspension; denied Tileston, City of Gainsville, Alachua County, Garrahan, Strauss and Hindery qualified immunity as to Bailey's conspiracy and arrest-related claims; and denied Caldwell, Hayes, Alachua County, City of Gainsville, Hindery, Tileston, Strauss, Garrahan, and Brown qualified immunity with respect to Bailey's name-clearing hearing claim. The district court also dismissed all of Lizzie Shirley Bailey's loss of consortium claims, none of which is at issue in this appeal.

A five-week jury trial on Bailey's remaining claims began on July 9, 1990. On that date, the district court orally granted Allison summary judgment on all remaining claims, dismissing him from this litigation. At the close of Bailey's case, all defendants moved for directed verdicts on various grounds; the district court deferred ruling on the motions until the close of all evidence. At that time, the remaining defendants renewed their directed verdict motions and Bailey moved for directed verdict as well. The district court denied Bailey's motion, but granted directed verdicts for Tileston, Alachua County, City of Gainsville, Strauss, Garrahan and Hindery as to Bailey's conspiracy and arrest-related claims. The basis of the district court's ruling was that Tileston had probable

---

**3.** The district court's reference to "initial" and "continuing" suspension has resulted in substan-

tial confusion. We resolve this issue infra at part III(A)(3).

cause to arrest Bailey. The district court also directed verdicts in favor of all defendants on all of Bailey's state claims, none of which is at issue in this appeal. Furthermore, the district court directed verdicts in favor of Tileston, City of Gainsville, Strauss, Brown, Garrahan and Hindery on Bailey's name-clearing hearing claim. These directed verdicts left three defendants (Caldwell, Hayes and Alachua County) and two claims (procedural due process and name-clearing hearing) for the jury. After the jury returned its verdict for Alachua County, and for Bailey against Caldwell and Hayes on both claims, Bailey, Caldwell and Hayes filed motions for directed verdicts, judgments notwithstanding the verdict, or a new trial. The district court denied all motions and this appeal followed.

## III. DISCUSSION

### A. Bailey's Appeal

#### 1. *Arrest–Related Claims*

 Bailey asserts that the district court erred in granting directed verdicts in favor of City of Gainsville, Alachua County, Hindery, Garrahan, Strauss and Tileston on his arrest-related claims. In granting these six defendants directed verdicts, the district court first found that Tileston had probable cause to arrest Bailey. Bailey argues, however, that Tileston did not have probable cause to arrest him of any crime[4] and that the defendants conspired to, and did, falsely arrest and prosecute him. Furthermore, Bailey asserts that the defendants "individually and collectively

possessed information that would lead a reasonable and honest person to know that he was innocent." Brief of Appellant 24. If Tileston had probable cause for the arrest, then these defendants did not violate Bailey's Fourth Amendment rights against false arrest as protected through § 1983. *See Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir.1990) (existence of probable cause is an absolute bar to a § 1983 action premised on false arrest). Specifically, Bailey argues that the district court erred by taking the question of probable cause from the jury. We disagree. When considering whether a directed verdict should be upheld, our standard is the same as that applied by the district court. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989). Thus, we consider all the evidence and resolve all inferences in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people, in the exercise of impartial judgment, could not arrive at a contrary verdict, then the motion was properly granted. *Id.* A mere scintilla of evidence does not create a jury question; there must be a substantial conflict in evidence to create a jury question. *Id.*

 We (and the district court) must evaluate these facts and inferences according to the legal standard for probable cause.[5] Simply stated, that standard requires that an arrest be objectively reasonable under the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 229, 103 S.Ct. 2317, 2327, 76 L.Ed.2d 527 (1983). A familiar formulation holds

---

**4.** Bailey's arrest report reflects a violation of Florida Statute § 843.11, conveying tools into jail to aid escape. Tileston's post-arrest investigation, however, led him to doubt that Bailey had been involved in the April escape attempt, and Bailey was subsequently charged with bribery, unlawful compensation and unlawful possession of $500 in the jail instead. Tr. 37–574–48; Ex. 31. Bailey's efforts to attach significance to this change, however, is unpersuasive. The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest. *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir.1973); *State v. Cote*, 547 So.2d 993, 996 (Fla. 4th DCA 1989).

**5.** We note that Bailey's briefs to this Court mistakenly conflated the standards that a court uses in ruling on a directed verdict motion and the standard that an arresting officer must use in determining whether probable cause for an arrest is present. An officer is not required, as Bailey argues, to resolve all inferences and all factual conflicts in favor of the suspect. An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect. *See United States v. Pantoja–Soto*, 739 F.2d 1520 (11th Cir.1984), *cert. denied*, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985).

that a "law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir.1990). Probable cause requires more than mere suspicion, but does not require convincing proof. Indeed, "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).

■ The district court properly found that Tileston had probable cause to arrest Bailey by examining what the evidence revealed that Tileston knew at the time of the arrest. Tileston knew that an escape attempt had occurred at ACDC in April and that one of the inmates involved in that escape attempt had implicated Bailey. Tileston had investigated this tip by interviewing Jerkins personally and by checking Jerkins' reliability with city and county law enforcement officers even though Tileston was already familiar with Jerkins. Bailey did not controvert this at trial. Tileston also knew that Cole had heard a comment regarding the $500 transmitted through Jerkins' body bug around midnight. At trial, Bailey admitted that around midnight Jerkins had said "I want out. I want to get out. I've got $500 for you now and $1,000 for you Sunday night," and that Bailey had responded by telling him to "stay cool." Tr. 24–572–140. Bailey also admitted that he never notified anyone of

Jerkins' midnight bribe attempt during his shift. Tr. 25–573–61 to 65. Although Bailey testified that he had twice *attempted* to notify his sergeant *after* taking the money from Jerkins, he admitted that he did not succeed in communicating with anyone. The district court accepted Bailey's testimony regarding his notification attempts as true, but correctly noted that it was also true that Bailey did not communicate this fact to anyone "at, near, or after his arrest." Tr. 39–576–109. Furthermore, Tileston knew that the money had passed to Bailey through Brown's verification. *Id.* at 112–13. And finally, Tileston knew that Bailey said nothing about having the money in his pocket when confronted in his work area, when walking to Allison's office, and when informed he was under arrest in Allison's office. Only when asked did Bailey turn over the $500.

Moreover, in directing a verdict for these defendants based on probable cause, the district court properly accepted as true Bailey's version of the events. *See* Tr. 39–576–107 to 114. The flaw in Bailey's efforts to undermine Tileston's probable cause is that Bailey's version of the facts failed to create a substantial conflict in what Tileston knew at the time of the arrest.[6] For instance, Bailey makes much of his prior communications with Strauss, Garrahan and Phillips regarding inmate contacts. Bailey testified that he had previously talked with Strauss regarding inmate contacts and that he had written Garrahan a letter in February 1987 regarding inmate contacts, which Garrahan referred to Strauss. Bailey also testified that he told Strauss that he had been approached again by an inmate[7] as Strauss was leav-

---

**6.** Bailey argues that Cole, not Tileston, arrested him. Bailey has not shown a substantial conflict in the evidence regarding who arrested him. Testimony from Bailey, Tileston, Brown and Cole supports that it was Tileston who arrested Bailey. Bailey takes Cole's statement that an arrest may have "technically" occurred when he and Tileston first confronted Bailey rather than later in Tileston's office out of context to make this argument. We need not decide this issue, because we find that Tileston had probable cause to arrest Bailey at either point. Tileston testified that he made the decision to arrest

Bailey in Allison's office after learning that the money had passed from Jerkins to Bailey. Thus, from the time Tileston left that office to confront Bailey and bring him back to Allison's office, no facts changed that would disturb the district court's probable cause decision.

**7.** Unknown to Tileston (or anyone else), Jerkins had taken it upon himself to phone Bailey at home during the afternoon prior to Bailey's arrest in an unplanned effort to further entice Bailey into conversation with him.

ing ACDC and Bailey was arriving the evening prior to Bailey's arrest. Furthermore, Bailey testified that he told Phillips, the corrections officer on duty with Bailey the night of his arrest, generally about *prior* inmate contacts and his communications with Strauss and Garrahan. Although the lack of communication among ACDC personnel is unfortunate,[8] none of Bailey's prior discussions was reported to Tileston. The record is clear that Tileston did not know of these prior communications until months after the arrest. It was also uncontroverted that Strauss told *no one* of Bailey's comment during shift change the evening prior to Bailey's arrest. Bailey also points to the fact that Brown had not given Tileston his written investigative report concerning the April escape attempt, and argues that had he done so Tileston would have known that he was innocent. Bailey, however, overstates the significance of this omission. Brown's written report, apparently unlike his oral report to Tileston, would have told Tileston that Tribuani had confessed to his role in the April

escape attempt. The report would not have definitively established the source of the hacksaw blades used in that escape attempt, nor would it have ruled out the possibility that another escape attempt (involving Bailey) was being formulated. Thus, none of these factors that Bailey points to undermine what Tileston did know at the time of the arrest;[9] none of these factors undermine the district court's determination that Tileston had probable cause to make that arrest.[10] Accordingly, we agree that Tileston had probable cause to arrest Bailey and we affirm the district court's final judgments for all defendants with respect to all of Bailey's arrest-related claims.

### 2. Conspiracy Claims

■ As noted above, Bailey's theory of this case was not only that the defendants had falsely arrested him, but also that they had *conspired* to deprive him of his civil rights by arresting, jailing and suspending him without due process of law. The dis-

---

**8.** Moreover, ACDC's poor communication was enhanced by the nature of an undercover internal investigation, where the methodology involved isolation and deference to a "need to know" communication standard. In addition, Bailey's prior communications were all vague or general references to inmate contacts—none mentioned Jerkins (or anyone else) by name. This level of generality made it less likely that these communications would have retained significance in the minds of Garrahan and Strauss in the face of their (and others') testimony that inmate contacts are a common problem that jail personnel must handle. In any case, Bailey's arguments that communication between the ACDC officers should have been better are misdirected. Negligent acts do not give rise to § 1983 liability. *Daniels v. Williams,* 474 U.S. 327, 336, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986).

**9.** At trial, each officer asked testified that Bailey should have immediately notified his superior when Jerkins attempted to bribe him and especially when he actually accepted the $500. They also testified that Bailey could have interrupted his feeding duty with no breach of security to notify someone that he had just confiscated $500. *See, e.g.,* Tr. 28–562–255 to 257. Once again, Bailey's arguments that he might have taken the $500 because it was contraband, not because he was taking a bribe (like his explanation of why he had the money in his pocket), affect his ultimate guilt or innocence, not the

reasonableness of Tileston's decision to arrest him. To restate, Bailey did not have to be guilty to be arrested.

**10.** Although the district court indicated that the defendants were entitled to the protection of qualified immunity once probable cause was found, see Tr. 39–576–113–14, we note that granting qualified immunity on this basis was an unnecessary step. If probable cause is present, there is no need for the defendants to rely on the qualified immunity defense. "The existence of probable cause … is an absolute bar to a section 1983 action for false arrest." *Marx v. Gumbinner,* 905 F.2d 1503, 1505–06 (11th Cir.1990). Because we uphold the district court's finding of probable cause, we do not address the question of whether the defendants may have been entitled to qualified immunity in the absence of probable cause. Although several defendants argue that only "arguable probable cause" is necessary for qualified immunity, we do not reach that issue. *Compare Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990) ("In determining whether qualified immunity exists, the issue is 'not probable cause in fact but "arguable" probable cause,'" quoting *Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir.1989), in turn quoting *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir. 1985)) *with Llaguno v. Mingey,* 763 F.2d 1560, 1569 (7th Cir.1985) (en banc) (Judge Posner noting that giving defendants an opportunity for qualified immunity in the absence of probable cause gives them "two bites at the apple").

trict court, however, found that there was a "total lack of evidence" to support Bailey's theory that Alachua County, Hindery, City of Gainsville, Strauss, Tileston and Garrahan conspired to deprive him of his property and liberty by falsely arresting him, jailing him, and suspending him from his job. Tr. 39–576–114. Our *de novo* review of the record supports the district court's conclusion. No reasonable juror could have found a conspiracy because Bailey presented no evidence of one. To prove a 42 U.S.C. § 1983 conspiracy, a plaintiff "must show that the parties 'reached an understanding' to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy." *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991). This, Bailey did not do. Indeed, the record in this case reveals just the opposite of conspiracy. Whereas the linchpin for conspiracy is agreement, which presupposes communication, the defendants in this case suffered from an extreme lack of communication. Thus, we agree with the district court that Bailey failed to establish his conspiracy theory of liability and affirm the district court's final judgments for all defendants on this claim.

### 3. *Procedural Due Process Claims*

#### a. Against Caldwell, Hayes and Allison

 As a public employee, Bailey possessed a property right in his continued employment with ACDC. *See, e.g., Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). Indeed, this question does not seem to have been disputed below. What is disputed is whether Bailey was deprived of that property right without due process of law—that is, what process was Bailey due and what did he receive? In answering that question, we note that neither the personnel policies of Alachua County nor the state law of Florida provides the answer. Rather, federal constitutional standards determine what process Bailey was due. *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). Bailey challenges several issues related to his suspension without pay from ACDC. First, the district court initially granted Allison, Caldwell, Hayes and Alachua County summary judgment as to Bailey's "initial suspension" without pay in its July order. Confusion has reigned since. Bailey argues that by "initial suspension," the district court meant Allison's May 14th letter. Thus, according to Bailey, the court left open a window of potential liability beginning on May 26th when Allison wrote Bailey a second letter suspending him without pay. Bailey, however, argues that the district court erred in not leaving this window open as of May 14. Caldwell, Hayes and Alachua County argue that the district court's "initial suspension" freed them from liability up to the point at which Bailey's criminal charges were dropped and he requested reinstatement and a hearing (November 19, 1987).[11] Although the parties participated in a lengthy argument on this point in chambers, the district court did not resolve the dispute at that time or thereafter. *See* Tr. 20–569–3 to 11. Caldwell and Hayes also assert that perhaps their window of liability opened as late as February 13, 1988. On that date Allison left ACDC: since the district court had granted summary judgment to Allison on the procedural due process claims because "he was already gone," Caldwell and Hayes reason that they, too, must be free from liability for this period because it was Allison who actually wrote all three letters to Bailey.

 Fortunately, we need not affix dates to Bailey's procedural due process claims to resolve this confused issue. Rather, as developed below, we separate Bailey's procedural due process claim into two strands: (1) his claim that he was deprived of due process when he was sus-

---

11. Caldwell and Hayes, in their cross appeal, argue that they were entitled to qualified immunity as to Bailey's entire procedural due process claim. We address this argument in part III(B)(1)(b) below.

pended without pay at the time of his arrest on May 14, 1987 without notice or an opportunity for a hearing (the "predeprivation procedural due process claim"), and (2) his claim that he was deprived of due process when ACDC continued his suspension without pay after May 14, 1987 without notice and an opportunity for a hearing (the "postdeprivation procedural due process claim"). The district court stated in its July order that "they [Allison, Caldwell and Hayes] reasonably believed that Bailey's suspension without pay without a predeprivation hearing was lawful, considering the seriousness of the charges against him." R. 388. The district court then granted qualified immunity to Allison, Caldwell, and Hayes for Bailey's initial suspension. We think that the proper interpretation of the district court's ruling is that Bailey had not carried his burden of demonstrating that the law was clearly established that he had a constitutional right to a predeprivation hearing before being suspended. To defeat a qualified immunity defense, Bailey was required to show that the defendants violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); *see also Rich v. Dollar*, 841 F.2d 1558, 1563–64 (11th Cir.1988) (explaining shifting burdens of proof once defendant raises affirmative defense of qualified immunity). In deciding whether a constitutional right is clearly established, we must judge the contours of the law at the time the employment decision was being made, irrespective of subsequent developments in the law. Thus, public officials are charged with keeping abreast of the current state of the law, not with anticipating changes.

Whether the law is "clearly established" is a question of law that we review *de novo*. *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir.1991). We agree with the district court that Bailey did not carry his burden of establishing that he had a clearly established constitutional right to a predeprivation hearing.

▮ In *Parratt v. Taylor*, 451 U.S. 527, 539–40, 101 S.Ct. 1908, 1914–15, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court stated that the requirement of a hearing does not always require the state to provide a hearing *prior* to the initial deprivation. "[T]he necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Id.* 451 U.S. at 539, 101 S.Ct. at 1915. After noting that the "fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner,'" the Court confirmed that it had "rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property." *Id.* at 540, 101 S.Ct. at 1915 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)); *see also Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (delay of nine months in providing postdeprivation hearing not constitutionally infirm).[12]

12. The flexibility in the constitutional requirements pertaining to a predeprivation hearing derives from the balancing approach first enunciated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The need for some form of predeprivation hearing is determined from balancing the competing interests at stake. "These are the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termi-

nation." *Loudermill*, 470 U.S. at 542–43, 105 S.Ct. at 1493–94 (citing *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903). Thus, while we agree with Bailey that in the usual case notice and an opportunity to be heard before being deprived of a property interest reflects standard due process requirements, Bailey did not succeed in demonstrating that the particular circumstances of his case made it unreasonable for Caldwell, Hayes and Allison to believe that it was lawful

In applying this flexible legal standard regarding predeprivation due process to the facts of this case, we conclude that Bailey did not establish that Caldwell, Hayes and Allison reasonably would have known their action in initially suspending him without pay upon his arrest was unlawful. A corrections facility's paramount concern is security; a guard suspected of corruption compromises that security. Therefore, the defendants could have reasonably believed that this was a situation with a "necessity for quick action" that made a predeprivation hearing impracticable. Furthermore, the defendants were all aware that Alachua County's personnel regulations provided an appeal procedure for employees to contest disciplinary action taken against them. It would have been reasonable for the defendants to believe that these procedures were capable of providing Bailey an adequate postdeprivation remedy. Thus, we agree with the district court's ruling that Caldwell, Hayes and Allison are entitled to qualified immunity with respect to Bailey's procedural due process claims regarding his right to a predeprivation hearing.[13]

The district court correctly allowed Bailey's postdeprivation procedural due process claim to remain viable, however, and it ultimately went to the jury against Caldwell, Hayes and Alachua County. It should also have gone to the jury against Allison. Section 1983 requires proof of an affirmative causal connection between the official act or omission complained of and the alleged constitutional deprivation. *See Williams v. Bennett*, 689 F.2d 1370, 1380–81 (11th Cir.1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Allison did not leave his employment with ACDC until February 13, 1988; all three letters from Allison to Bailey regarding his suspension[14] were sent before that time (May 14, May 26 and December 7, 1987). At trial, Allison testified that he consulted with Caldwell and Hayes and received their approval for the action he took against Bailey on May 14. Tr. 28–562–1172 to 174. Although Hayes, who was Alachua County's Personnel Director, denied the degree of consultation that Allison attributed to her, *see* Tr. 29–563–91, 92, as did Caldwell, *see* Tr. 29–563–116, 117, Bailey established sufficient evidence to warrant jury consideration of Caldwell and Hayes' personal involvement. For instance, Hayes testified that "[i]t would be my responsibility to ensure that these [lengthy suspensions without pay] situations don't happen." Tr. 29–563–69.[15] And Caldwell testified that he was the person "in charge of the administrative action taken against the Department of Corrections personnel." Tr. 29–563–122, 123. We conclude that Bailey presented sufficient evidence so that a reasonable jury could find the requisite causal connection between the acts or omissions of each of the three defendants and his alleged depri-

---

to forego a hearing prior to May 14 when Bailey was arrested and suspended.

**13.** Although Bailey argues that he could have been suspended with pay from the beginning, we do not think that he carried his burden of establishing that the contours of that right were clearly established at the time in question. His only source of this option is one sentence of dicta in *Loudermill*: "[I]n those situations were the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." *Loudermill*, 470 U.S. at 544–45, 105 S.Ct. at 1494–95. While we agree that the problem of a postdeprivation remedy may be avoided by suspending with pay, for then there is not a deprivation, we do not think that by pointing to one sentence Bailey carried his burden of showing that suspension with pay in the circumstances of this case was required by clearly established law.

**14.** We note that although various defendants have argued at various points that the wording "leave without pay" (December 7 letter) as opposed to "suspension without pay" (May letters) is significant, we disagree. In the face of uncontroverted evidence that no hearing or other administrative proceeding was held to determine Bailey's status, this semantic difference is insignificant for our purposes. Indeed, Bailey's status with ACDC was still uncertain at the time of trial. *See, e.g.,* Tr. 29–563–122 (testimony of Caldwell).

**15.** Hayes also testified that as of May 1987 she was aware of court precedent on "giving the employee a hearing to air his side of or his position when he was subjected to disciplinary proceedings or suspension proceedings." Tr. 29–563–68, 69.

vation with respect to his employment with ACDC. The jury is the appropriate body to resolve any factual conflicts in the evidence and to make credibility determinations where applicable. There is nothing in the record to support a principled legal distinction between Allison, Caldwell and Hayes in regard to Bailey's postdeprivation procedural due process claims. Allison should have gone to the jury along with Caldwell and Hayes on Bailey's postdeprivation procedural due process claims; he was not entitled to summary judgment because he was "already gone" as the district court held.

### b. Alachua County

▬▬▬▬ Bailey also argues that Alachua County should be held liable on his procedural due process and name-clearing hearing claims and that the district court erred by refusing to grant either his motion for directed verdict or his motion for judgment notwithstanding the verdict as to Alachua County. Our standard of review on this issue is the same as discussed above in reference to a directed verdict motion. *See supra* part III(A)(1). We find firm support for the jury's verdict for Alachua County in the record. A local government cannot be held liable for its employees' acts under § 1983 on a theory of respondeat superior; the liability must be founded on an official policy or custom. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). An isolated decision by a municipal employee constitutes official policy only if that employee has "final policymaking authority" for the challenged act under state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). In this case, the record is devoid of evidence that either Caldwell, Hayes or Allison had "final policymaking authority" for Alachua County's personnel policy. Testimony at trial was unequivocal that final policymaking authority rested in the Board of County Commissioners. Furthermore, the record is also devoid of evidence that Alachua County had any official policy or custom to deny Bailey any name-clearing hearing to

which he may have been entitled. On the record before us, no reasonable jury could have found liability on the part of Alachua County for Bailey's procedural due process or name-clearing hearing claims. Thus, we affirm the district court's final judgment dismissing all of Bailey's claims against Alachua County.

In summary, as to Bailey's appeal we affirm all of the district court's judgments except for the dismissal of Allison from this litigation through summary judgment. Furthermore, we have clarified that the viable procedural due process claims remaining against Caldwell, Hayes and Allison are postdeprivation claims; the district court properly granted these three defendants qualified immunity as to Bailey's predeprivation procedural due process claims.

## B. Caldwell & Hayes' Appeal

Caldwell and Hayes mount a two-pronged attack. First, they argue that they were entitled to qualified immunity on Bailey's procedural due process and name-clearing hearing claims and accordingly assert that the district court erred in not granting either their motions for summary judgment, their motions for directed verdict or their motions for JNOV. Second, they argue that several errors in the conduct of the trial warrant reversal of the jury's verdict. We discuss these two prongs of their argument below.

### 1. *Qualified Immunity*

#### a. Name Clearing Hearing.

Caldwell and Hayes argue that the district court erred in denying them qualified immunity with respect to Bailey's claim that they deprived him of a constitutionally protected liberty interest by not providing him a name-clearing hearing for alleged stigmatizing information contained in his personnel file. In its omnibus July order, the district court denied Caldwell and Hayes qualified immunity on this issue, subjecting them to liability on this claim from May 1, 1989 forward. Tr. 14-388-12. The court highlighted May 1, 1989 because of this Circuit's decision on that date in

*Buxton v. City of Plant City, Fla.,* 871 F.2d 1037 (11th Cir.1989). The district court reasoned that the law became "clearly established" on that date; thus, Caldwell and Hayes were not entitled to summary judgment on the basis of qualified immunity. Whether the law is clearly established is a question of law we review *de novo. Moore v. Morgan,* 922 F.2d 1553, 1556 (11th Cir.1991). We agree with Caldwell and Hayes that the district court erred in denying them qualified immunity on this claim; they were entitled to qualified immunity as a matter of law on this issue.

 In deciding whether the law is clearly established, we ask whether the legal contours of the right at issue are clear and specific enough for a reasonable official to have known that her actions were unlawful. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Courson v. McMillian,* 939 F.2d 1479, 1488 (11th Cir.1991). *Buxton* explicitly stated that it faced an issue of first impression in this Circuit in deciding whether placing stigmatizing information in the personnel file of a public employee constitutes publication sufficient to trigger the employee's right to procedural due process. *Buxton,* 871 F.2d at 1042. Thus, prior to *Buxton,* it was not clearly established that Bailey was entitled to a name-clearing hearing regarding alleged stigmatizing information in his personnel file. To hold Caldwell and Hayes accountable to Bailey for decisions rendered during the pendency of Bailey's litigation is to hold them to too stringent a standard. Caldwell and Hayes filed motions to dismiss' this claim on the basis of qualified immunity on March 21, 1989, well before

*Buxton* was decided. *See* R. 141. Caldwell and Hayes are entitled to qualified immunity with respect to Bailey's name-clearing hearing claims; that issue should not have gone to the jury.[16]

### b. Procedural Due Process Claim

 Caldwell and Hayes also argue that they were entitled to qualified immunity with respect to Bailey's procedural due process claims. As noted above, the district court granted Caldwell and Hayes qualified immunity with respect to Bailey's "initial" suspension. We have concluded that this is best seen as granting Caldwell and Hayes qualified immunity for Bailey's predeprivation claim, and we uphold that decision. Caldwell and Hayes also argue that they are entitled to qualified immunity with respect to Bailey's postdeprivation claim. As noted earlier, here they ask too much. Although the district court did not explicitly rule on Caldwell and Hayes' qualified immunity defense, we interpret the district court's actions as rejecting that defense.[17] Furthermore, we agree that Caldwell and Hayes are not entitled to qualified immunity for Bailey's postdeprivation procedural due process claims.

Unlike his efforts regarding his predeprivation due process claim, Bailey has shown that the law was clearly established that he was due some "meaningful" process within a "meaningful" time. *See supra* part III(A)(3). Moreover, Bailey has shown a substantial conflict in the evidence that prohibits us from deciding whether Bailey received less process than he was due as a matter of law. At trial Caldwell, Hayes and Allison testified that they did not give

---

**16.** Because we hold that Caldwell and Hayes qualifiedly immune as to Bailey's name-clearing hearing claim, we do not address the balance of their arguments on this claim such as whether any information in Bailey's file was "false."

**17.** Caldwell and Hayes first assert that the district court erred in not explicitly ruling on whether they were entitled to qualified immunity, and then, by refusing to submit the issue of qualified immunity to the jury. This argument is contrary to the law in this circuit. *See Ansley v. Heinrich,* 925 F.2d 1339, 1348 (11th Cir.1991) (qualified immunity is an affirmative defense

from trial and not a defense to liability issues raised during trial, thus once it is denied pre-trial, the jury should determine the factual issues without any mention of qualified immunity); *see also Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (qualified immunity is in essence an immunity from suit). We recognize, as did the panel in *Ansley,* that there is a split of authority in the circuits as to whether qualified immunity from damages may be asserted at trial and is properly included in jury instructions. *See Ansley,* 925 F.2d at 1345–48.

Bailey notice of his appeal rights. The personnel procedures applicable to ACDC employees require that an employee receive notice of his appeal rights when disciplinary action is taken against him. Caldwell and Hayes attempted to deflect their technical noncompliance by arguing that Bailey had used the appeal procedure before and was already aware of it, thus obviating the need for them to provide him notice or at least making their failure to provide him notice harmless. The only evidence introduced by Caldwell and Hayes on this point, however, was letters from Bailey regarding some overtime pay he believed he had been shorted. *See* Plaintiffs Exhibit 201. Neither Bailey's handwritten letter regarding this overtime pay nor a typewritten letter that a secretary at ACDC had done for Bailey mention the appeal process to which Caldwell and Hayes referred. *See id.* Therefore, a jury could have reasonably resolved this fact-bound notice issue in Bailey's favor.

Furthermore, Caldwell and Hayes both asserted at trial that Bailey was not entitled to a hearing from ACDC until his criminal charges were dropped and that they would not have provided him with one had he made a request. Caldwell and Hayes' argument is that a hearing would have been futile while criminal charges were pending against Bailey, thus excusing them (at least up to that point) from not providing him with a hearing regarding his employment with ACDC.[18] Their argument tries to prove too much: "The right to a hearing does not depend on a demonstration of certain success." *Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 544, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985) (citing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978)). Perhaps Bailey could have convinced ACDC to suspend him with pay or to place him in a non-security position during the pendency of the criminal action against him; perhaps Bailey would not have even appeared at his hearing. Simply put, the answers to these questions are irrelevant. Moreover, it is inconsistent for

Caldwell and Hayes to argue both that the personnel regulations provided Bailey all the process he was due and in the same breath admit that they would not have given Bailey a hearing (or that he was not entitled to one) until his criminal charges were dropped. A jury is entitled to resolve this inconsistency as it sees fit. Moreover, Bailey did request a hearing—the day after he learned that his criminal charges had been dropped, which makes his request extremely timely if measured from the point at which Caldwell and Hayes testify the measurement should start. These are examples of factual disputes concerning Bailey's procedural due process claim that prohibit us from rendering a decision on this claim as a matter of law. These issues may be addressed more succinctly upon remand for a new trial against Caldwell, Hayes and Allison on Bailey's postdeprivation procedural due process claims. We have already concluded that Allison should have been a defendant in Bailey's postdeprivation due process claim and that Bailey's name-clearing hearing should not have gone to the jury. As discussed below, we also find that significant prejudicial errors were committed during the trial, requiring reversal of the jury's verdict for Bailey against Caldwell and Hayes.

### 2. *Trial Errors*

#### a. Motion to Sever

■ The first ruling that Caldwell and Hayes attack is the district court's refusal to sever the employment-related due process issues from the earlier false arrest, false imprisonment and conspiracy issues. They argue that a district court may order separate trials of any claims or issues "in furtherance of convenience or to avoid prejudice, or when separate trial will be conducive to expedition and economy." Fed. R.Civ.P. 42(b). Furthermore, Rule 21 provides that "any claim against a party may be severed and proceeded with separately." Fed.R.Civ.P. 21. We will not disturb a district court's decision not to order sepa-

---

**18.** Moreover, although closely factually related, the criminal process against Bailey would not have automatically resolved his employment rights with Alachua County.

rate trials absent an abuse of discretion. *T.D.S. Inc. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520, 1535 (11th Cir.1985), *modified on other grounds,* 769 F.2d 1485 (11th Cir.1985). Although our review of the record in this case does not enable us to conclude that the district court's severance denial alone was an abuse of discretion warranting reversal of the jury's verdict, we do find that this issue raises substantial doubt and question that further reinforces our decision to reverse the jury verdict on the basis of the other errors we discern. We now turn to those errors.

b. Juror Johns

 Caldwell and Hayes argue that the district court abused its discretion by refusing to exclude a juror (Johns) from the panel. The district court denied their counsel's request that Johns be stricken from the jury panel for cause (no preemptory challenges remained). Tr. 20–569–117 to 119. Our question on appeal is whether there is fair support in the record for the district court's conclusion that the juror would be impartial. *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984). We conclude that the required support is missing in this case. At the time of trial, Johns had been employed at Shands Hospital for ten years in the psychiatric unit and was working as an administrative assistant to the Senior Director of Nursing. Tr. 20–569–50, 51, 67,

68. Before the trial, Johns knew both Bailey and Dr. Waldman, Bailey's treating psychiatrist and a witness in the case. Shands hospital is not only the institution at which Bailey was treated and in which Bailey was hospitalized for over a month, it was also his employer at the time of trial. Tr. 20–569–50 to 52. Thus, Johns was a coworker of Bailey's and of Dr. Waldman's. Johns testified that she knew many of the potential witnesses through her employment. Tr. 20–569–106, 107.

Johns' relationship to Bailey and to Dr. Waldman raised substantial doubts about her ability to serve as a juror fairly and impartially. What is more, the colloquy between Johns and the court did not dispel these doubts. "Doubts about the existence of actual bias should be resolved against permitting the juror to serve, unless the prospective panelist's protestation of a purge of preconception is positive, not pallid." *United States v. Nell,* 526 F.2d 1223, 1230 (5th Cir.1976).[19] The record in this case leaves juror Johns' impartiality in question. The record reveals that the district court interrupted Johns before letting her finish her response to questions about her knowledge of Bailey and his mental condition, leaving that issue inadequately explored.[20] Furthermore, Johns responses to whether her connections to Bailey would make any difference to her ability to serve as an impartial juror were hesitant and equivocal.[21] Because Bailey's mental con-

---

**19.** In *Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**20.** One relevant portion of Johns discussion with the district court is as follows:

> THE COURT: [Anything about your knowledge of] Mr. Bailey that would, in any way, tend to influence your verdict in this case?
> MS. JOHNS: I don't feel so at all but—
> THE COURT: Could you tell us how you know him through acquaintanceship at the hospital?
> MS. JOHNS: That's awkward for me because at least my awareness of him has to do with a confidentiality issue at the hospital.
> THE COURT: Does it have to do with any of his physical or mental condition?
> MS. JOHNS: Yes, sir . . . .

THE COURT: [Y]ou have become aware of certain facts about Mr. Bailey or certain conditions, either emotional or mental that he may have or what?
MS. JOHNS: Only in the very broadest of sense. I do work with inpatient units, so I don't know anything in particular about him. I just know that he has been—
Tr. 20–569–51, 52.

**21.** Johns' uncertainty is revealed in the following excerpt of her sidebar conference with the district court:

> THE COURT: [Bailey] was a patient?
> MS. JOHNS: He also is an employee at Shands. I've seen him as an employee.
>
> . . . . .
>
> THE COURT: Would any of [this] make any difference to you sitting on the jury?
> MS. JOHNS: I don't believe so but I'm not quite sure. I'm not the one to make that decision.

dition was a key issue at trial, and because the record discloses that Johns herself was uncertain about her ability to be impartial, we agree with Caldwell and Hayes that the district court abused its discretion in refusing to exclude Johns for cause. *See Depree v. Thomas*, 946 F.2d 784, 790 n. 11 (11th Cir.1991) (distinguishing between potential bias that further investigation eliminates and potential bias that is either not adequately explored or not adequately eliminated by further investigation). In sum, we do not find fair support in the record for the district court's conclusion that juror Johns would be impartial.

c. Jury Instructions on Damages

██ Caldwell and Hayes contend that the district court abused its discretion in refusing to submit Caldwell and Hayes' requested instruction on damages to the jury. They argue that the district court's jury instruction on damages was prejudicial and misleading because it failed to separate the damages attributable to claims involving false arrest and imprisonment from the damages attributable solely to Bailey's procedural due process claims. We agree. Caldwell and Hayes asked the Court to instruct the jury that it could not award damages against them that were caused by the arrest, imprisonment or prosecution of Bailey. Instead, the court instructed the jury, *inter alia*, that "you should assess the amount you find to be justified by the preponderance of the evidence as full, just and reasonable compensation for all of the plaintiffs' [sic] damages." Tr. 42–578–17.

Judge Fay has recently explained this Court's approach in addressing a challenge to a denied jury instruction:

On appeal, we examine whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled. The trial judge's refusal to give a requested instruction is not error

where the substance of that proposed instruction was covered by another instruction that was given. If a requested instruction is refused and is not adequately covered by another instruction, the court will first inquire as to whether the requested instruction is a correct statement of the law. In such a scenario, if the requested instruction does accurately reflect the law, the next step is to assess whether the instruction addresses an issue that is properly before the jury. Even if both of these criteria are met, there must still be a showing of prejudicial harm that resulted from the failure of the trial court to give the requested instruction before the judgment will be disturbed on that ground.

*Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1569 (11th Cir.1991) (citations omitted).

Applying this step-by-step analysis to the facts of this case, we conclude that the district court's refusal of Caldwell and Hayes' requested jury instruction was prejudicial error. First, the substance of Caldwell and Hayes' requested instruction was not covered by another instruction nor by the balance of the instructions as a whole. For five weeks the jury heard testimony regarding not only Bailey's alleged damages from a procedural due process violation, but also regarding his alleged damages from his arrest-related claims. This was because those claims were viable until the district court directed verdicts on them at the close of all testimony. On the eve of jury deliberations, the class of defendants suddenly decreased from ten to three. After that, any damage flowing from Bailey's lawful arrest was not compensable. Realizing that the jury had heard testimony regarding all of Bailey's damages, Caldwell and Hayes requested instruction endeavored to focus the jury on damages attributable to them.[22] Moreover, their requested

THE COURT: We wanted to know what you know about him.
MS. JOHNS: I have no personal connection at all.
THE COURT: Cause is denied....
Tr. 20–569–119.

22. Although Caldwell and Hayes argue that Bailey did not prove that he was damaged by their alleged procedural due process violation, the record reveals that Bailey adequately proved damages. Medical experts for both sides testified that Bailey's mental condition was the re-

instruction accurately reflected the law. Only those damages actually resulting from a procedural due process deficiency may be compensated. *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). Continuing Judge Fay's suggested analysis, the issue of Bailey's mental and physical damages was properly before the jury. Furthermore, the district court's refusal to give Caldwell and Hayes' requested instruction allowed the jury to consider all of the damage testimony they had heard throughout five weeks of trial. No instruction could have taken away all the testimony the jury heard regarding Bailey's conspiracy and false arrest claims. However, an instruction such as the one Caldwell and Hayes requested could have explicitly cautioned the jury that it should not consider damages attributable to the lawful arrest. The district judge's refusal of this instruction, combined with the failure of the instructions as a whole to specify the damages the jury could properly consider, prejudiced Caldwell and Hayes.[23]

In summary, as to Caldwell and Hayes' appeal, we find that the aggregate effect of several errors warrants reversal of the jury's verdict against Caldwell and Hayes: the district court's refusal to exclude juror Johns, its refusal of Caldwell and Hayes' requested damage instruction, its error in submitting Bailey's name-clearing hearing

claim to the jury, and the substantial doubt and question raised by its refusal to sever the procedural due process claims from the other claims. We also find that the district court correctly denied Caldwell and Hayes qualified immunity with respect to Bailey's postdeprivation procedural due process claims. Thus, a new trial is necessary.[24]

## IV.

Accordingly, we AFFIRM the district court's elimination of all defendants except for Caldwell, Hayes and Allison. We REVERSE the district court's summary judgment for Allison on Bailey's procedural due process claim. We REVERSE the jury's verdict for Caldwell and Hayes, and REMAND for a new trial against Caldwell, Hayes and Allison on Bailey's postdeprivation procedural due process claims. We AFFIRM the jury's verdict in favor of Alachua County. The elimination of the majority of original defendants and claims will lead to a much simpler and straightforward trial on remand. All that remains for the new trial is Bailey's postdeprivation procedural due process claim against Allison, Caldwell and Hayes. Bailey's motion for fees pursuant to 42 U.S.C. § 1988 is moot at this time.

sult of the arrest, his suspension, and all events that followed. *See, e.g.,* Tr. 30–564–20; Tr. 23–571–113, 189, 190. Thus, we reject Caldwell and Hayes argument that Bailey did not prove that the alleged procedural due process violations were a cause of his mental deterioration. There is ample support in the record to conclude that a reasonable jury could have found that the claimed procedural due process violations were a significant cause of Bailey's physical and mental damages.

**23.** Caldwell and Hayes unsuccessfully objected to the damage instructions given. Tr. 42–577–70.

**24.** While we have considered the possibility of remanding solely on the issue of damages, this would not be appropriate for several reasons. Foremost, we cannot say that the prejudicial jury instructions on damages, combined with the presence of juror Johns, who we have decided should have been excluded for cause, affect-

ed only the jury's assessment of damages against *Caldwell and Hayes. Furthermore, we have also decided that Allison should have gone to the jury as well as Caldwell and Hayes and have noted considerable confusion throughout this trial on the procedural due process claims and the window of liability that was open against the defendants. We have also determined that the name clearing hearing issue should not have gone to the jury and have expressed doubts regarding the decision to not sever the due process claims from the dramatic claims regarding Bailey's lawful arrest. Thus, the cumulative effect of these problems is substantial enough to* warrant a new trial for Caldwell, Hayes and Allison on the issue of Bailey's postdeprivation procedural due process claims. We note that Alachua County was not affected by the confusing damage instructions because the jury did not find the county liable on any of Bailey's claims. Our exhaustive review of the record in this case supports the jury's verdict that Bailey made no evidentiary showing on which a jury could reasonably find Alachua County liable.